JOSEPH V. CHERRY et al., Plaintiffs-Appellants, v. MICHAEL G. McDONALD et al., Defendants (Michael D. McDonald, Defendant-Appellee).

Fourth District   No. 4—88—0043

Opinion filed November 10, 1988.

Mark E. Ferguson and Harlan Heller, both of Harlan Heller, Ltd., of Mattoon, for appellants.

S. Craig Smith, of Dillavou, Overaker, Asher, Smith & Dole, of Paris, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiffs appeal a jury verdict in defendants', Michael G. McDonald and Michael D. McDonald (Michael), favor in a negligence action stemming from an automobile accident. Plaintiffs argue the jury's verdict is contrary to the manifest weight of the evidence, the trial court erred in denying plaintiffs' motion for a directed verdict, and the verdict cannot stand in light of modern trends in the doctrine of comparative fault.

We affirm.

The genesis of this action is an automobile accident that occurred on January 13, 1984, at approximately 5:30 p.m. Michael D. McDonald was driving eastbound on Interstate 72 toward Mahomet, Illinois. Michael began to experience problems with his vehicle and attempted to pull off the highway into an authorized vehicle turnaround. As Michael slowed to make the turn, he was struck from behind by a semitrailer truck driven by Christopher C. Thornton. The truck was owned by McBride's Express, Inc. The truck tipped over onto its side and came to rest with the cab in the median and the trailer lying across Interstate 72. The eastbound passing lane was completely blocked by the trailer. The trailer also extended into a portion of the driving lane. Approximately 5 to 10 minutes after the initial collision, plaintiff Joseph Cherry (Joseph) collided with the semitrailer truck. A third collision occurred shortly thereafter when a Volkswagen driven by Margaret Ross collided with the trailer of the overturned semi. Joseph Cherry and his wife, plaintiffs, sued Michael, Michael's father, Thornton, and McBride's Express, Inc. This appeal concerns Michael and his father.

PLAINTIFFS' CASE

The plaintiffs called Michael as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1102.) Michael was 16 years old when the accident occurred. He testified that he left White Heath, Illinois, shortly after 5 p.m. From White Heath he drove eastbound on Interstate 72 toward Mahomet. The lanes of the road are 12 feet wide and the shoulder of the road is 8 to 10 feet wide. Interstate 72 is a four-lane divided highway in good repair. It was dusk when Michael began his trip. Michael was driving with his headlights on and there were other vehicles on the highway.

Michael testified that shortly after he left White Heath, he noticed a ticking noise coming from the engine of his car. He recognized the sound as an indication that the car needed oil. Therefore, he planned to turn into an authorized vehicle's turnaround so he could check his car and return to the Clinton exit. Approximately 30 seconds before he started to turn off the highway, Michael saw the semi in the left lane behind him. Michael stated that he had moved from the right-hand lane into the left-hand lane with the truck behind him. He estimated that he was driving approximately 50 to 55 miles per hour. Michael stated, however, that he slowed to approximately 30 miles per hour prior to making his turn. He used his turn signals.

As Michael changed lanes, he looked into his rear-view mirror and saw the headlights of the truck. Michael stated the truck's lights were dim and seemed a good distance behind him. He continued to travel in the left-hand lane. At this point in time, he began to slow down gradually and prepared to enter the turnaround. As Michael began to enter the turnaround, he was hit from behind and thrown in a northeast direction. Michael did not remember seeing the truck approach his vehicle nor did he make any quick decrease in speed prior to the collision. After impact, the semitrailer tipped over onto its side and came to rest partly on the highway and partly in the median. The truck was completely blocking the eastbound passing lane and extended into the driving lane a little over the dividing line.

Michael stated he exited his vehicle and proceeded to the truck, then he started walking toward a vehicle which had come to assist them. Michael saw Joseph's car collide with the back of the trailer. As Joseph's car approached the truck, Michael was walking west on the side of the road approximately one-fourth of a mile away from the truck near the Randy Bimes vehicle. Four or five cars had

passed the overturned trailer prior to the impact involving Joseph, which occurred about 10 minutes after the first impact.

The plaintiffs next called Thornton as an adverse witness. Thornton stated that he has been employed by McBride's Express, Inc., as an over-the-road driver. Thornton left Decatur at approximately 5 p.m. and was headed east on Interstate 72. He was traveling at approximately 50 to 55 miles per hour in the right-hand lane until approximately one mile prior to the accident. It was just beginning to get dark and the road was dry and clear. At that time, Thornton noticed two sets of taillights in the right-hand lane in front of him. Thornton moved into the left-hand lane to pass these two cars. Thornton continued to drive at approximately 50 to 55 miles per hour. He caught up with the first car and attempted to pass. Thornton was alongside the first car when Michael's car, the lead car, made a quick movement into the left-hand lane and applied the brakes.

Thornton further testified that he applied his brakes but was unable to stop. His truck collided with the back of Michael's car and capsized. It blocked the passing lane and about two feet of the driving lane. After his truck came to a rest, it took Thornton approximately two to three minutes to exit the cab. He then went to see if anyone was hurt and talked to Michael. Thornton did not put out flares or fuses and there were no lights on the belly of the truck. Soon after he exited the cab, someone yelled, "This guy is not going to stop." Thornton witnessed Joseph's vehicle collide with the trailer of the truck. Thornton stated he did not hear the engine of Joseph's car slow down prior to the collision, but the car swerved slightly to the right before impact. Joseph's accident occurred approximately 5 to 10 minutes after the first collision. Thornton could not remember lights shining on the bed of the truck prior to the impact. A subsequent impact occurred five minutes later.

Margaret Ross testified that she was driving east on Interstate 72 at approximately 5:30 p.m. It was very dark and she had her headlights on. Ross noticed a car with hazard lights on near the shoulder of the road. At this time she took her foot off the accelerator, slowed to approximately 30 to 35 miles per hour, and pulled to the middle of the road. Ross stated she did not notice the truck lying across Interstate 72 until she was approximately 20 yards away from it. At that time, Ross applied her brakes and slid into the trailer of the truck. Approximately 90% of the driving lane was blocked by the trailer. The collision between her car and the truck was minimal, however, as she was almost able to stop. Ross further

stated that she saw a man standing near the driving lane. She believed she could have driven around the truck were it not for the person flagging traffic. She did not want to hit him. The car with its emergency lights on was three yards from the truck. Neither she nor her daughter was wearing safety belts. However, neither was seriously injured.

At approximately 5:50 p.m., Officer Willie Gartrell, an Illinois State trooper, was dispatched to the scene of the accident. Upon arrival, Gartrell noticed a semitrailer truck overturned on Interstate 72. The cab portion of the truck was positioned in the median, the trailer portion was covering the entire passing lane and extended three to six feet into the driving lane. The trailer did not block 80% to 90% of the driving lane. It blocked three to six feet, which is 25% to 50% of the lane. Gartrell admitted he had previously stated one to three feet of the lane were blocked. The cab was facing north, and the vehicle was on the passenger side with the belly of the truck and wheels facing west. There were no reflectors, fuses, or flares around the tractor trailer when Gartrell arrived upon the scene.

Gartrell further observed a Volkswagen which was still in direct contact with the underneath portion of the tractor trailer. Gartrell stated the Volkswagen was straddling the center line. Gartrell found the plaintiff's vehicle off the highway near a divider fence between private property and the interstate. The plaintiff's car was facing west and had sustained extensive damage to the front portion. Gartrell stated the only skid marks on the highway were located entirely in the left lane and were made by dual tires. He concluded the skid marks were caused by the truck.

Joseph testified that he had been in Springfield and was returning home to Chicago when the accident occurred. He could not recall the collision and does not remember being within five miles of the place of the collision. Joseph further testified to the extent of his injuries and the consequent limitations imposed upon his activities.

Dr. Louis Daniel Metz, an accident reconstruction and vehicle dynamics expert and faculty member at University of Illinois, testified he examined the road where the accident occurred. He performed time and distance calculations to determine Joseph's abilities to stop in time to avoid an accident. Metz estimated a speed of 50 miles per hour and stated he did not believe Joseph would have been able to see the trailer in time to avoid the collision assuming reasonable lighting conditions.

On cross-examination, Metz admitted that he did not consider light from the moon when calculating the lighting conditions. If Jo-

seph had been able to see a silhouette of the truck one-eighth to three-eighths of a mile away, he could have stopped.

DEFENDANTS' CASE

Danielle Max, a resident of Monticello, testified she and her husband William were traveling east at approximately 55 miles per hour on Interstate 72. The moon was out and the weather clear. They came upon the accident scene, slowed down gradually, and passed the trailer without incident. The Max couple parked their car on the shoulder of the road, turned the emergency lights on, and William went back to the scene of the accident. Some vehicles passed prior to Joseph's accident. Some time elapsed and then the collision between Joseph's vehicle and the truck occurred.

William testified that as he approached the scene of the accident, he saw a silhouette of something lying across the highway. At that time, he was approximately one-eighth to three-eighths of a mile away from the scene. He reduced his speed from 55 miles per hour by decelerating and came to a stop adjacent to the area where the trailer was lying across the highway. William did not remember maneuvering around the truck. William further stated that several cars passed the scene of the accident without incident after he stopped and before the second accident. He and his wife stopped before Joseph's collision with the truck.

Michael presented the evidence deposition of Randy Bimes. Bimes stated that although he did not see the actual impact, he saw the truck tip over onto its side. Bimes stopped his car on the right-hand shoulder of the westbound lane and ran over to the cab of the semi-trailer, which had come to a stop in the median, and talked to the driver about getting out because of the smell of diesel fuel. The trailer extended two to three feet into the driving lane.

Bimes further testified that after speaking to the truck driver, he returned to his car, drove through the turnaround and parked his car facing oncoming eastbound traffic about 75 to 100 yards in front of the accident. Bimes left the lights of his car as well as the emergency lights turned on. Bimes then exited his car and began waving down oncoming traffic. Shortly after he left his car, Joseph's car approached the scene of the accident. Bimes saw Joseph's car, tried to wave it down, and turned to watch as it hit the trailer. He did not see the car slow or hear braking prior to its collision with the trailer. Bimes did not remember hearing brakes at all. The vehicle was traveling 50 or 60 miles per hour. After Joseph's vehicle hit the trailer, the vehicle careened into the south side of the eastbound lane. On cross-

examination, Bimes stated he did not measure how many yards he drove in front of the truck. It could have been 50 to 100 yards. He admitted there may have been an error in his judgment at an earlier interview where he said he parked 35 yards away from the turn-around.

## McBRIDE'S EXPRESS, INC., AND THORNTON'S CASE

Kenneth Smith testified he was traveling westbound on Interstate 72 with his wife on the date of the accident. Smith witnessed three vehicles heading east in the right-hand lane as he approached the authorized vehicle turnaround. Smith stated the semi changed lanes as it approached the turnaround and then the second car went into the passing lane in front of the truck. The car did not signal and immediately began to slow down in an attempt to enter the turnaround. Smith saw the truck strike the car in the rear and then tip over onto its side.

Smith stopped his car on the right-hand shoulder of the westbound lane of Interstate 72. He left his flashers on and proceeded to the scene of the accident. Smith talked to the driver of the truck and started to assist him in getting out of the cab. A minute elapsed between the time he arrived and the driver exiting the truck. Smith then witnessed the impact between Joseph and the trailer of the truck. Smith stated the accident occurred perhaps a minute after the driver of the truck had exited the cab. Smith was standing in the median and yelled as Joseph's car approached. Smith further stated that Joseph was traveling at normal interstate speed and did not slow down prior to coming into contact with the trailer. Smith was standing about 30 feet away from the truck and was flashing a flashlight, which he had retrieved from his vehicle, on the bed of the trailer as Joseph's vehicle approached the scene. It was a standard flashlight. Joseph's vehicle was the first one he observed approach after the initial impact.

Barbara Smith stated that she observed three vehicles traveling eastbound on Interstate 72. Barbara remained in the car after her husband parked their car on the shoulder. Barbara witnessed the impact between Joseph and the trailer of the cab. Barbara saw Joseph's car traveling eastbound at a normal speed. She observed it failed to slow down prior to coming into contact with the trailer. The second impact occurred approximately six minutes after the first impact.

Thornton testified that he was employed by McBride's Express and was driving from Decatur when the accident occurred. Thornton admitted that after the impact with Michael's car, he did not place

any reflectors or fuses around the trailer of the truck. It took him two to three minutes to get out of the truck. The impact with Joseph's vehicle occurred three to four minutes later. Subsequently, the Ross collision occurred.

REBUTTAL

Dr. Dalias Price, a retired professor of climatology, testified that on the night of the accident, the moon was at 66% of its brightest capacity. The moon would illuminate the surface of the earth and moonlight is similar to sunlight.

The jury returned a verdict in favor of Michael, Michael's father, and McBride's Express, Inc. Thornton was dismissed from the suit at the close of the evidence. McBride's Express, Inc., subsequently settled with plaintiffs and is not involved in this appeal.

The plaintiffs initially assert that defendant was negligent as a matter of law and that the evidence established defendant's acts were the proximate cause of plaintiffs' injuries. Therefore, they contend the verdict was contrary to the manifest weight of the evidence. At trial, Michael admitted he failed to maintain the minimum speed required on Interstate 72 (Ill. Rev. Stat. 1985, ch. 95½, par. 11—606) and made an illegal U-turn (Ill. Rev. Stat. 1985, ch. 95½, par. 11—305(a)). According to plaintiffs, the statutory violations are *prima facie* evidence of Michael's negligence.

■■ We agree that a violation of a public safety statute is *prima facie* evidence of negligence. (See *Feldscher v. E & B, Inc.* (1983), 95 Ill. 2d 360, 447 N.E.2d 1331; *Filipetto v. Village of Wilmette* (1985), 135 Ill. App. 3d 781, 482 N.E.2d 358.) Such conduct, however, is actionable only where it is shown to be the proximate cause of a plaintiff's injuries. (See *Feldscher*, 95 Ill. 2d 360, 447 N.E.2d 1331; *Filipetto*, 135 Ill. App. 3d 781, 482 N.E.2d 358.) A statutory violation does not obviate the need to determine whether a defendant's conduct proximately caused the injuries of which a plaintiff complains. (*Feldscher*, 95 Ill. 2d 360, 447 N.E.2d 1331.) Consequently, the controversy in the instant appeal centers upon the existence of proximate cause.

■■ ■ A finding of negligence requires proof that the defendant owed a duty to plaintiff, defendant breached this duty, and the breach was the proximate cause of the damages suffered by the plaintiff. (*Ogle v. Fuiten* (1983), 112 Ill. App. 3d 1048, 445 N.E.2d 1344, *aff'd* (1984), 102 Ill. 2d 356, 466 N.E.2d 224.) Upon review, a jury's finding in a negligence cause of action shall stand unless it is contrary to the manifest weight of the evidence. A determination of whether a defendant's acts were the proximate cause of plaintiff's injuries is a

jury question. (*Tressler v. Winfield Village Cooperative, Inc.* (1985), 134 Ill. App. 3d 578, 481 N.E.2d 75.) In *Filipetto,* the court noted the concept of proximate cause serves to limit liability. The *Filipetto* court stated:

> "If the negligence charged does nothing more than furnish a condition by which the injury is made possible and that condition causes an injury by the subsequent independent act of a third party, the defendant's actions are not a proximate cause of the injury. \*\*\* The test is whether the first wrongdoer should have reasonably foreseen the intervening cause as a natural and probable result of his negligence. \*\*\* An injury follows as a natural and probable result where an ordinarily prudent person ought to have foreseen that some injury might occur, although the precise injury which in fact occurred need not have been foreseen." *Filipetto,* 135 Ill. App. 3d at 784, 482 N.E.2d at 360.

The *Filipetto* court noted comparative fault has diminished the need for a policy which protects a remotely negligent defendant from full liability. However, proximate cause remains an element of a negligence action and remains a jury question. Both plaintiffs and defendant refer to *Anderson v. Jones* (1966), 66 Ill. App. 2d 407, 213 N.E.2d 627, in support of their contention as to proximate cause. *Anderson* involves successive vehicle collisions. Jones lost control of his vehicle on Interstate 74 near Champaign, Illinois. The Jones car went across the median and into the oncoming lanes of traffic, where it collided with a car owned by Johnson. As a result of the collision, the Jones vehicle came to rest in the eastbound lane of Interstate 74, completely blocking traffic. Shortly after this collision, plaintiff arrived at the scene and stopped his car. While plaintiff was sitting in his car, defendant Zehr collided with the plaintiff's vehicle. The Zehr collision occurred several minutes after the initial collision. In determining whether Jones' negligence was a proximate cause of the Zehr collision, the court analyzed the following factors:

> "(a) lapse of time; (b) whether the force initiated by the original wrongdoer continued in active operation up to the injury for which recovery is sought; (c) whether the act of the intervenor can be considered extraordinary rather than usual or normal; and (d) whether the intervening act was a normal response to the situation created by the wrongdoer or an extraordinary response." *Anderson,* 66 Ill. App. 2d at 412, 213 N.E.2d at 629-30.

The *Anderson* court found the immediate cause of the plaintiff's

injuries and damages was the force set in motion through the negligent act of Zehr. The force set in motion by Jones had spent itself and was quiescent. *Anderson,* 66 Ill. App. 2d at 412, 213 N.E.2d at 629.

■■ Since the determination of proximate cause is one for the jury, each case must rest upon its own facts. As a result, no two situations are completely analogous. The issue can only be determined from a complete examination of the factual situation. From the instant facts, the jury could have concluded the negligence involved in Michael's conduct was quiescent. Several minutes had passed between the initial collision and the collision between the trailer and Joseph's vehicle. Several persons had avoided colliding with the truck, lights were shining on and around it, and Joseph did not appear to react to the presence of the truck or lights. The jury could have reasonably concluded that Joseph's actions or inattentiveness caused the impact. It could also have concluded Thornton was negligent in not setting out flares. We recognize the Ross impact occurred after Joseph's impact with the truck. However, the jury could have concluded Ross would have avoided the collision had she not feared the person at the side of the road would step into the driving lane. Under such circumstances, we cannot say the verdict was contrary to the manifest weight of the evidence.

■■ Plaintiffs next argue the trial court erred in denying their motion for a directed verdict. Plaintiffs again focus on proximate cause, asserting Michael's violation of the statutes and its proximate cause of Joseph's accident were established as a matter of law. A verdict should only be directed when all evidence, considered in a light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based upon the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) As noted above, a jury question existed as to proximate cause. Under such circumstances, a directed verdict would have been improper. The trial court correctly denied the motion.

Plaintiffs finally assert the jury's verdict in the instant case cannot stand since the policy concerns which support the proximate cause doctrine are diminished by the application of comparative fault concepts. Defendant notes that proximate cause is still an element of a negligent action and the issue was correctly submitted to the jury here.

■ The adoption of the doctrine of comparative negligence in Illinois has diminished the need for a policy which protects the remotely negligent defendant from liability for the full measure of damages.

However, proximate cause remains an element of the cause of action under the rules of comparative negligence. *Michalak v. County of La Salle* (1984), 121 Ill. App. 3d 574, 459 N.E.2d 1131; see generally *Cox v. Stutts* (1985), 130 Ill. App. 3d 1018, 474 N.E.2d 1382.

■ In the instant case, the issue of proximate cause was properly submitted to the jury. Evidence existed from which the jury could have determined defendant was not the proximate cause of plaintiffs' injuries. A jury's determination that a defendant is or is not the proximate cause of an injury will only be reversed if it is contrary to the manifest weight of the evidence. (*Salvi v. Montgomery Ward & Co.* (1986), 140 Ill. App. 3d 896, 489 N.E.2d 394.) Plaintiffs essentially ask this court to reverse the jury's determination on policy grounds. While we agree comparative fault has lessened the need to protect a remotely negligent defendant, it has not eliminated the concern. Proximate cause remains an element of a negligence action.

For the above reasons, we affirm the trial court.

Affirmed.

KNECHT and SPITZ, JJ., concur.